# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOSHUA DILLON ROH*, BM3, United States
Coast Guard,
7633 Ringneck Drive
Lincoln, NE  68506

                                    *Plaintiff*,

    v.

KARL L. SCHULTZ, Admiral, Commandant,
United States Coast Guard,
2703 Martin Luther King Junior Avenue, S.E.,
Washington, DC  20593,

JOANNA NUNAN, Rear Admiral, Deputy
Commandant (DCMS-DPR), United States
Coast Guard*,
2703 Martin Luther King Junior Avenue, S.E.,
Washington, DC  20593,

WILLIAM G. KELLY, Rear Admiral,
Superintendent, United States Coast Guard
Academy,
31 Monhegan Avenue Parkway,
New London, CT  06320,

ARTHUR L. RAY, Captain, Commandant of
Cadets, United States Coast Guard Academy,
31 Monhegan Avenue Parkway,
New London, CT  06320, and

AKANINYENE INYANG Lieutenant, Golf
Company Officer, United States Coast Guard
Academy,
31 Monhegan Avenue Parkway,
New London, CT  06320,

                                    *Defendants.*

|  |
|---|
| Civil Action No. _____ |
| **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## STATEMENT OF THE CASE

1.      Plaintiff Boatswain's Mate Third Class (BM3) Joshua Roh is a 22 year-old young

man of exemplary character who, until May 11, 2021, was slated to graduate with the United

States Coast Guard Academy (USCGA) Class of 2021 just eight days later, commission as an

Ensign in the Coast Guard, an honorably serve as a deck officer.

2.      That bright future, a future Plaintiff Roh had earned through four years of

extraordinarily hard work at the Coast Guard Academy, was suddenly and wrongfully taken from

him when, on the morning of May 11, then-Cadet Roh was summoned into the office of

Defendant Kelly, the USCGA Superintendent, who summarily informed Cadet Roh that he was

being disenrolled.

3.      The purported bases for the disenrollment were 1) a "pattern of misconduct"

resulting in the accumulation of more than 100% of the maximum allowable demerits as a first

class cadet and 2) "continued concern regarding [Cadet Roh's] deficiencies in emotional

regulation and professional interactions."  Both of these assertions were disingenuous, if not

patently misleading.  They are, in fact, a thin and insubstantial veneer by which the Coast Guard

Academy Command seeks to cover up its own institutional failures and repeated violations of

law, actions and omissions that not only do not warrant disenrollment, but constitute repeated

and intentional violations of Coast Guard regulations, the Administrative Procedure Act (APA),

the United States Constitution, and the Military Whistleblower Protection Act (MWPA).

4.      Carefully hidden beneath these alleged "justifications" is the abject and deliberate

failure of the Coast Guard Academy's Command to respond in any meaningful manner to the

shocking sexual assault Cadet Roh suffered at the hands of another male cadet in the Spring of

his third class year, the traumatic aftermath of which lies at the core of whatever "deficiencies in

emotional regulations and professional interactions" Cadet Roh had allegedly exhibited in the

wake of that disgraceful failure to help him.  Indeed, this is a case that should give pause not

only to the Commandant and Deputy Commandant of the Coast Guard, the Coast Guard writ large, and the Department of Homeland Security, but to Congress itself, because it exposes and illuminates the pervasive, anti-male gender bias that is the undercurrent of the Coast Guard Academy's efforts to demonstrate to the world that its Sexual Assault Prevention Response (SAPR) Program is working.  As the following particularized allegations of fact demonstrate, irrespective of whatever "strides" the Coast Guard Academy may claim to have made in "Righting the Ship"[1] as to female midshipmen who claim victim status, no such "Righting" has occurred for male victims of sexual assault like Cadet Roh.

5.      Cadet Roh's efforts to call attention to, and seek help for, the debilitating trauma he suffered as the result of a sexual assault, served only to put a retaliatory target on his back and underpinned the callous rationalizations on which his chain of command justified the pejorative and disparaging narrative they created, perpetuated, and executed through a series of overblown, arbitrary, capricious, and targeted conduct charges principally driven by his company officer and ratified by the Commandant of Cadets and the Superintendent.  Simply stated, the company officer and other members of the chain of command concluded that "real men don't get sexually assaulted" and that the trauma from which Cadet Roh was suffering was a contrivance and a poor excuse for his allegedly sub-standard performance and conduct violations.  The failure of the Coast Guard Academy to take any corrective action for this and other acts of retaliation against Cadet Roh was precisely one of the key leadership failures outlined in the "Right the Ship" Report.

6.      The barrage of baseless and overblown conduct charges to which Cadet Roh was

---

[1] *See Righting the Ship; The Coast Guard Must Improve its Processes for Addressing Harassment, Bullying, and Retaliation*, United States House of Representatives, Committee on Oversight and Reform, Committee on Homeland Security, Majority Staff Report, 11 December 2019, a copy of which is attached as Exhibit A.

subjected led to the improper imposition of not one, not two, but three different remediation programs.  Remarkably, notwithstanding a remediation workload that probably represented seven additional credit hours, Cadet Roh still made the Dean's List in the final semester of his first class year.  His tireless, relentless commitment to the remediations spoke volumes about the level of his commitment to earning his diploma and his commission, and the more than 50 journal entries he made over the course of those remediations provide a window into the strength of his character and his clear suitability for service.

7.     All of those exemplary efforts were of no moment to an institution bent on retaliating against Cadet Roh and seeing to his personal destruction.   The means by which Defendants and others carried out that destruction were invidious and remarkably simple:  trump up any number of baseless, overblown conduct charges and a false, pejorative narrative that was the callous perversion of Defendants' own institutional failures, and then deprive Cadet Roh of even the most basic due process in his efforts to defend himself.

8.     Nor was Cadet Roh given any meaningful opportunity to be heard on his appeal from Defendant's Kelly's decision to recommend disenrollment.  A few days after Cadet Roh had to watch the rest of his class graduate, commission, and leave him behind, Cadet Roh sought an audience with Defendant Kelly, seeking an opportunity to be heard on an appeal he was given five business days to pull together and submit.  When Cadet Roh appeared in Defendant Kelly's office, Kelly, out of uniform and wearing a track suit, summarily dismissed Cadet Roh's recounting of the enormous steps he had taken through three separate remediation processes to demonstrate his suitability for service, stating, "You can load test your assertions out in the Fleet."

9.     But there is perhaps no more egregious example of the Due Process deprivations

at the heart of this case than this:  On June 14, 2021, Cadet Roh submitted a single-spaced, 25-page supplemental appeal, with 124 pages of exhibits, to Defendant Nunan seeking a reversal and rejection of Defendant Kelly's disenrollment recommendation.  Defendant Nunan denied Cadet Roh's appeal ***the next day***, without even a one-word explanation, let alone the reasons or bases required by the APA.  A copy of the denial is attached as Exhibit A.

10.     Moreover, the notion that this so-called "appellate" process bore even a modicum of independence or objectivity is patently absurd given the degree to which the highest levels of the Coast Guard Academy and Coast Guard command structure are hopelessly infected with cultural corruption and cronyism.  This "Admiral's Club," which likes to hold itself out as a "family," adheres only to the guiding principles of favor-bank reciprocity, perquisites, billet-grooming, and covering for one another.  That one member of this exclusive Club might question or reverse the decision of a fellow Club member is a practical impossibility, rendering as fatally arbitrary all of the decision-making at issue in this case.

11.     Through this Complaint, BM3 Roh seeks a declaration from this Court that the administrative conduct proceedings at issue here violated the APA, BM3 Roh's procedural and substantive Due Process rights and his right to Equal Protection under the Fifth Amendment, a declaration that Defendants' actions and inactions violated the MWPA, and an injunction ordering that Plaintiff Roh graduate from the Coast Guard Academy and receive his commission as an Ensign in the Coast Guard.

**PARTIES**

12.     Plaintiff, Joshua Roh is a Boatswain's Mate Third Class in the U. S. Coast Guard.  He is a resident of the State of Nebraska.

13.     Defendant Karl L. Shultz, Admiral, was at all times relevant the Commandant of

5

the Coast Guard.  His public office is the U.S. Coast Guard Headquarters in Washington, DC.

Defendant Shultz is sued in his official capacity.

14.     Defendant Joanna Nunan, Rear Admiral, was at all times relevant the Deputy

Commandant of the Coast Guard (DCMS-DPR).  Her public office is the U.S. Coast Guard

Headquarters in Washington, DC.  Defendant Nunan is sued in her official capacity.  By statute

and regulation, Defendant Nunan is vested with final agency authority to disenroll cadets from

the U.S. Coast Guard Academy.

15.     Defendant William G. Kelly, Rear Admiral, was at all times relevant the

Superintendent of the U.S. Coast Guard Academy.  His public office is the U.S. Coast Guard

Academy in New London, Connecticut.  Defendant Kelly is sued in his official capacity.

16.     Defendant Arthur L. Ray, Captain, was at all times relevant the Commandant of

Cadets at the U.S. Coast Guard Academy.  His public office is the U.S. Coast Guard Academy in

New London, Connecticut.  Defendant Ray is sued in his official capacity.

17.     Defendant Akaninyene Inyang, Lieutenant, was at all times relevant Golf

Company Officer at the U.S. Coast Guard Academy.  His public office is the U.S. Coast Guard

Academy in New London Connecticut.  Defendant Inyang is sued in his official capacity.

## JURISDICTION AND VENUE

18.     The Court has jurisdiction under 28 U.S.C. § 1331.

19.     The Court may award declaratory and injunctive relief under the Administrative

Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. §§

2201-02, the Fifth Amendment to the United States Constitution, and the Military Whistleblower

Protection Act (MWPA), 10 U.S.C. § 1034.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and 1391(e).

**STATEMENT OF FACTS**

*Background*

21.     Joshua Dillon Roh is 22 years old and hails from Lincoln, Nebraska, where he attended Lincoln East High School.  His performance and achievements there across all metrics were exceptional.

22.      In academics, Cadet Roh graduated with a 4.52+ on a 4.0 scale, a grade point average attributable in part to the many AP and Honors Classes at which he excelled.  His best ACT score was a 30.

23.     Cadet Roh's superlative academic performance was matched, if not exceeded, by his accomplishments on the varsity swim team.  He earned a varsity letter all four years in high school, was the team captain his senior year, and was the captain of the Boys All-City Team for 2 years.  He was an All-American in the 400 Free Relay.  He was named to the All-State team 3 years running.  He was a runner up for Nebraska Swimmer of the Year in both his junior and senior years, and was a state runner up in both the 200 and 500 Free his senior year.  He was a four-time All-Conference Selectee, a four-time member of the All-State Academic Team, and a four-time scholar athlete award winner. Three times over, Cadet Roh was a USA Swimming Midwest Sectional Team member, won a USA Swimming Midwestern 2nd Team All Academic Award, was named to the Heartland Athletic Conference All Conference Academic Team, and was an Academic Letter winner.

24.     His extra-curricular and community activities included the Lunch Bunch (working with special needs students), serving as an Ambassador for East High (selected by the high school staff to represent the school to new students, families, community members, and foreign exchange students), served as Vice President of the Campus Spiritual Impact Bible Study Club,

and was a member of the Youth Group Leadership team at Faith Bible Church.  In his freshman year, he won a Shining Star Award, given to the top 25, out of more than 350 students, identified as positive leaders within the school.

25.    Not surprisingly, as a result of these outstanding achievements, Cadet Roh was recruited by South Dakota State University, Nebraska Wesleyan University, Midland University, Tiffin University, William Jewell University, the Merchant Marine Academy, and countless others. But Cadet Roh set all of them aside when he received, in December of his senior year of high school, an appointment to the Coast Guard Academy, the realization of his long-standing dream to serve his Country.

26.    As he did in high school, Cadet Roh set a number of superlative benchmarks at the Coast Guard Academy.  He was a member of the Men's Swim Team his fourth (freshman), third (sophomore), and second class (junior) years, competing in conference championships each year and placing in the top 12 in one or more events each year.  Indeed, he was a member of the 800 freestyle relay team that placed second to earn All-Conference honors at the New England Women's and Men's Athletic Conference Championship, setting a school record time of 6/46.14. Although he stepped down from the swim team his first class year, he quickly took on a leadership position during Inter Company Water Polo season, where he assisted in organizing brackets, setting up equipment, and refereeing competitions.  He also provided clinics with the Brazilian Jujutsu Club.  He was a member of the Physical Fitness Exam (PFE) Max Out Club and made the PFE Athletic Director's List more than once in light of his consistently superlative performance in semester PFE's.  And he earned a coveted German Armed Forces Gold Badge, based, among other things, on an evaluation report from the Superintendent recognizing his physical and moral standards.

8

27.     Cadet Roh was a three-year member of Cadets Against Sexual Assault. Throughout that time, he was able to assist several cadets in crisis, assisting them in obtaining the resources they needed both at the Academy and while on leave.  He was commended in November 2018 for "selfless dedication to the spirit of community service and commitment to the principles and mission of the Academy by achieving more than 20 hours of community service in the fall semester of 2018."  He also ran a recruiting blog to attract candidates to the Academy.

28.     Prior to his unlawful disenrollment, Cadet Roh was service-selected to be a deck watch officer on USCG Dauntless beginning June of 2021.

29.     Finally, Cadet Roh made the Dean's list in the final semester of his first class year, an achievement which, for the reasons that follow, was nothing short of remarkable.

### Spring 2019:  A Horrible Sexual Assault

30.     On 13 April 2019, Cadet Roh, then a third class cadet, traveled to New Haven, Connecticut with a friend and classmate, Kieran Clancy.  While there, the two purchased a bottle of vodka, which they intended to drink upon their return to the Academy.  Upon that return, at approximately 2200, Clancy went to his room to take a shower, and Cadet Roh returned to his own room.  A short time later, Clancy came to Cadet Roh's room, and the two began to eat food they had previously ordered and had delivered.  While they were eating, a third female classmate, 3/c X, arrived to "hang out" with her two male friends.  No one else was in the room.

31.     Once the food was consumed, the three classmates began to drink the vodka. After about 40 minutes, all three cadets were highly intoxicated.

32.     Cadet 3/c X fell asleep on the floor at some point.  3/c Clancy then pushed Cadet Roh on top of her, and as he was leaving the room, said that he expected Cadet Roh and 3/c X to be "fucking" when he returned.  Cadet Roh did nothing of the kind.

33.     Sometime later, Clancy returned to the room, stood in front of Cadet Roh, and proceeded to take off Cadet Roh's trousers and underwear.  Cadet Roh had no idea what was going on and said as much to Clancy.  Clancy then placed his hand around Cadet Roh's penis and began roughly to masturbate him.  3/c Clancy then got on his knees, began briefly to perform oral sex on Cadet Roh, then partially dropped his own pants and underwear, turned his buttocks to Cadet Roh, and tried to guide Cadet Roh's penis towards his buttocks.  Shocked by what was happening, Cadet Roh said, "What the hell?" and made clear to Clancy that he had absolutely no interest in any kind of sexual activity with Clancy.

34.     After Clancy left the room, Cadet Roh woke up 3/c X and escorted her back to her room.  There, he became emotional, disclosing to 3/c X some of what had just transpired.  3/c X tried to calm Cadet Roh down.  Two other classmates then came for Cadet Roh and brought him to the Academy's medical clinic.  Given Cadet Roh's level of intoxication, the clinicians had Cadet Roh taken to a local hospital, where he was treated, monitored, and later released.

***The Traumatic Aftermath, the Filing of Cadet's Roh's Unrestricted Sexual Assault Prevention and Response (SAPR) Report, and the Command's Failed Responses to Both***

35.     Emotionally and psychologically overwhelmed by the sexual assault, deeply afraid of running into Clancy again, but determined to report Clancy for his horrible attack, Cadet Roh filed an unrestricted SAPR report with the Academy's Sexual Assault Response Coordinator (SARC), Shannon Norenburg.  He filed the report with the expectation that the Command, like any military organization that took to heart the obligation to "take care of one's people," would protect him, take care of him, and assist him in recovering from the trauma he

had just suffered.  Little did Cadet Roh realize at the time how sadly mistaken he was to entertain any such expectations.

36.     Although Cadet Roh was interviewed by two Coast Guard Investigative Service (CGIS) agents six days after the assault, it would be weeks before a military protective order (MPO) was issued against Clancy.  Meanwhile, Cadet Roh was forced to see Clancy over and over again because the two shared the same major and the same classes.

37.     Even when the end of the semester brought that particular ordeal to a close, and despite the eventual issuance of the MPO, now-2/c Clancy returned to the Corps of Cadets' dormitory, Chase Hall, for summer cadre, something Cadet Roh did not realize until literally running into him at a passageway intersection.

38.     Shortly thereafter, Cadet Roh learned that the Assistant Commandant and summer regimental commander had assigned Clancy to a room within 40 feet of now-2/c X's room, despite that another MPO issued against Clancy to protect her required him to stay 50 feet away from her.

39.     Thus it became Cadet Roh's burden to point out the mistake to the Assistant Commandant and summer regimental commander.  It also became his burden to point out to both that another cadet who had made a workplace violence complaint against Clancy for leaving a note outside her door written in his blood had an incoming Swab sister who would be exposed to Clancy in conjunction with his duties as member of the waterfront cadre.

40.     In the wake of the trauma caused by the sexual assault, these burdens were unbearable; a full-fledged predator was on the loose on the grounds of the Academy, and the Command seemed to be doing nothing about it.

41.     Instead, in a classic display of the gaslighting that would ultimately be used a

pretext for Cadet Roh's disenrollment, the Assistant Commandant; Cadet Roh's company

officer, Defendant LT Akaninyene Inyang; and members of the regimental staff repeatedly

treated Cadet Roh as though he was not in his right mind and was not capably handling the

pressures of cadre summer leadership.

42.     Rather than recognizing that any such behavioral issues were directly attributable

to the Command's abject failure to follow its own SAPR regulations and to treat Cadet Roh's

post-traumatic stress, the Command turned that failure on its head, blaming Cadet Roh for failing

to "suck it up" and "get over" his assault.

43.     Thus began the creation of a pejorative and disparaging narrative, the perpetuation

and intensification of which Defendant Inyang would see to throughout Cadet Roh's second and

first class years.

44.     On multiple occasions during cadre summer, LT Inyang and members of the

regimental staff attempted to cite Cadet Roh for trumped-up, Class I conduct charges involving

alleged "victims" of assaults by Cadet Roh, one involving a slammed door (a standard cadre

summer practice) and the other involving a cell phone that bounced off of a couch and landed on

a cadet, charges the "victims" themselves found ludicrous.  LT Inyang personally told the

"victim" of the phone bounce that she should file an assault charge.

45.     Yelling, a standard feature of cadre summer, was acceptable, unless it was Cadet

Roh who was doing the yelling.  Indeed, it was only after one instance of this supposedly

unprofessional yelling that a senior member of the Command suggested, for the first time, that

Cadet Roh seek out counseling.  Cadet Roh had been cited and had received a Class II offense

for chastising a platoon executive officer who had promised to take a Swab (freshman) to the

clinic in Cadet Roh's stead.  The person who wrote him up was none other than the Assistant Commandant, who must surely have known about the sexual assault.

46.     Yet rather than recognizing, as any capable leader would, that Cadet Roh's behavior was a cry for help, the Assistant Commandant punished him.  And as for the means by which the suggestion to get counseling was delivered, it was communicated as, "Get a mental health evaluation for yourself or we will make you get one."

47.     Such treatment served only to exacerbate Cadet Roh's feelings of ostracism, isolation, abandonment, and vilification and his loss of faith in an institution he had dreamed of being a part of throughout high school.  As Cadet Roh pointedly explained in the personal statement he submitted with his appeal,

> I had no one to turn to and even my company officer, LT Inyang, started to treat me differently.  Because of this I became more withdrawn and introverted with my command and my classmates.  I never once felt supported by my command of shipmates and had to process through all of this alone.  It seemed to me that everyone looked with me with suspicion or distrust and I felt that I couldn't trust anyone, and even if I did what could I say!  Again I was bound by law to not disclose anything.  I was truly isolated in what should have been my home.

### Cadet Roh's Filing of an Anonymous Defense Equal Opportunity Climate Survey (DEOCS) Concerning LT Inyang

48.     During the first semester of Cadet Roh's second class (junior) year, Cadet Roh developed an interest in ancient Nordic culture after visits to Ancestry.com revealed his family's links to that culture.  One aspect of that culture was the use of runes in writing.  Cadet Roh taught himself to write in runes, displayed them on his whiteboard and elsewhere, and took the opportunity to teach other cadets about the runes and the mythology behind them.  When LT Inyang discovered Cadet Roh was doing so, he ordered Cadet Roh to stop the practice, despite Cadet Roh's pointing out that the runes had religious significance.

49.     Cadet Roh subsequently and anonymously reported the ban as a form of religious discrimination in a DEOCS early in the spring semester.  Sometime later, LT Inyang approached Cadet Roh and began to question him about the survey, obviously deducing that Cadet Roh was the source of the complaint.  Cadet Roh declined to discuss the matter, because the survey was supposed to be anonymous and confidential.

### *The Barrage of Overblown and Overcharged Conduct Offenses Lodged Against Cadet Roh*

50.     Before turning to the targeted efforts to run Cadet Roh out of the Coast Guard Academy his first class year, it bears noting that Cadet Roh received 15 demerits his Swab (freshman) year, 17 demerits his third class (sophomore) year (unsatisfactory room inspection, improperly filling out a spreadsheet), and 75 demerits his second-class year.  Notably, 60 of the 75 demerits were attributable to alleged outbursts or loss of temper directly related to Cadet Roh's untreated post-sexual assault trauma.  The other 15 demerits were for an unsatisfactory room inspection.

51.     The implication of this trend is obvious:  Cadet Roh was not a habitual conduct offender, but was made into one in the wake of the sexual assault.  This is not correlation; it is causation, for two related reasons.  First, the failure of the Command meaningfully to respond to the sexual assault and, second, the gender-bias-fueled, targeted campaign of harassment and retaliation against a male who was failing to demonstrate to the Academy's locker-room mentality that he was a "real man."

52.     Paragraphs 53 to 84 below discuss each of the conduct offenses with which Cadet Roh was charged.  The numerical designations in each of the subheadings correlate to the charge table contained in the Coast Guard Academy Regulations Manual.  The descriptive language of the subheadings is taken directly from those Regulations as well.

***1218:  Intoxicants, narcotics, drugs: unauthorized possession, use, abuse, including alcohol; 1402 Duty, grave neglect of***

53.     No greater example of the gross overcharging that made a minor-infraction molehill into a crime-of-the-century mountain exists than offenses for which Cadet Roh was charged and taken to "Mast" in February 2021.  Based on the titles of the charges alone, one would assume that Cadet Roh must have been drop-dead drunk or abusing drugs and ran a ship aground as the Officer of the Day(OOD).  The actual facts stand in stark contrast.  On the evening of a cadet social, Cadet Roh was unaware that he was scheduled to stand duty the next morning, because the OOD he was scheduled to relieve failed to notify him.  Cadet Roh attended the social, consumed some alcohol, but ceased doing so 10 hours before commencing the watch of which he was not made aware until after he left the social.

54.     The off-going OOD was not present for the turn-over that following morning, a violation of cadet regulations.  In fact, the off-going OOD did not meet with Cadet Roh and provide him with a brief passdown until shortly before noon meal.

55.     There were absolutely no issues related to the watch itself; indeed, Cadet Roh's supervisors, including even LT Inyang, praised him for his handling of the Barracks Inspection commencing at 0800 that morning, which was an all-hands event.

56.     Yet later that day at 2000, while Cadet Roh was still standing the watch, he was approached by two first class cadets, one of whom was the Golf Company executive officer, 1/c Aiden Uvanni and the other of whom, 1/c Grahm Luongo, had been the cadet in charge of the social the evening before.  The two presented Cadet Roh with a charge sheet drafted by 1/c Luongo listing three offenses related to his attendance at the social and the assumption of the watch the next morning.  The two 1/c then brought Cadet Roh into 1/c Uvanni's room to discuss the charges and to provide Cadet Roh with an opportunity to process them.  After 1/c Luongo left

the room, 1/c Uvanni said that he and the Golf Company commander had had no issues with the manner in which Cadet Roh had stood his watch, thought that he had performed well, believed the charges to be "excessive," and gave him the option to either finish out the watch or let 1/c Uvanni stand in for him.  Cadet Roh chose to complete his watch and appeared at the appointed time the following morning to turn the watch over.

57.     The excessiveness of the charges was not a total surprise given the spite and animosity with which 1/c Luongo had been treating Cadet Roh since their cadre summer, animus well-known to members of the Class of 2021.  Cadet Roh's roommate provided a statement prior to the Mast that, upon his return from the social, Cadet Roh seemed happy but not intoxicated.

58.     Notwithstanding these facts, he was ultimately charged with the two offenses above for consuming alcohol less than 12 hours before standing duty, was found guilty of both charges at a Mast before the Commandant, and was awarded 100 demerits, alcohol remediation, and devotion to duty remediation.  He was also placed on suitability for service probation.

59.     While it is certainly the case that a cadet may not consume alcohol less than 12 hours before standing duty, it is impossible to discern why such a violation – and in this case, an ***unknowing*** violation – should be charged at the same level, with the same sanctions, as a case involving knowing intoxication that substantively impacted a cadet's ability to perform his duties.

60.     As for the "grave" neglect of duty charge, there was absolutely ***no*** evidence supporting that charge.  By all accounts, Cadet Roh's assumption of his OOD duties was superlative.

61.     For the same reasons, the evidence failed to support either the alcohol or devotion to duty remediation programs Cadet Roh was ordered into.  The fact that Cadet Roh consumed

alcohol 10 hours, rather than 12 hours, before standing watch does not constitute an "Alcohol Incident," which is defined as "Any behavior, where alcohol is determined to be a significant or causative factor, that results in the member's loss of ability to perform assigned duties, brings discredit upon the Uniformed Services, or is a violation of the Uniform Code of Military Justice." Once again, there was no evidence that Cadet Roh's watchstanding was anything but superlative, let alone that it was degraded by Cadet Roh's consumption of alcohol 10 hours earlier. Thus, in the absence of an "Alcohol Incident," alcohol remediation was unwarranted, and in the absence of any failing in Cadet Roh's performance of his duties as OOD, the devotion to duty remediation was equally unwarranted

62.     There exists a wolfpack culture at the Coast Guard Academy that gave rise to the circumstances and reporting of these charges in the first instance. As ENS Tristan Oaks so aptly observed in the statement he submitted prior to Cadet Roh's mast:

> If I may, I would like to address the greater issue: if a cadet or cadets saw my roommate at the O-Club drinking, and they knew at that moment, or shortly afterwards, that he had OOD the following day, why did they choose to submit a Class I Offense against him instead of telling him that he needed to find a replacement for his OOD the following day? When I was a 4/c, the majority culture of the Corps was that every class was a single unit looking out for each other and trying to prevent things like this from happening. Maybe it's the fact that Swab Summer is getting easier by the year, decreasing the sense of class comradery a cadet used to come to expect, or that the Academy is fostering a Corps that would rather get ahead by putting down their peers than being the shipmates you would want looking out for you, especially later on in the fleet.

63.     It is troubling – and fundamentally unfair – that the Command would facilitate such a "gotcha," *Lord of the Flies* mentality, one anathema to unit cohesion, camaraderie, and esprit.

17

***2215: Obscene or vulgar conduct, language or writing; 2234 Judgement, failure to use good; breach of discipline***

64.     The facts here provide a second example of grossly excessive and overblown charges driven by LT Inyang and related to an "outburst" flowing directly from the Command's abject failure to assist Cadet Roh in working through his post-traumatic stress in the wake of his sexual assault.  This incident also reflects the retaliatory, personal vendetta behind LT Inyang's central role in the targeted conduct campaign against Cadet Roh, because it involves a minor personnel conflict, initially handled, as it should have been, at the lowest possible leadership level and later re-charged as a Class II offense by the company officer.  And it reflects the supreme irony that is clearly lost on the Superintendent and the Command:  while the Superintendent specifically pointed to this incident as a prime example of Cadet Roh's "emotional regulation issues" and a "pattern of behavior" during his tenure as a cadet, it was, in fact the Superintendent's leadership failures, and the Command's leadership failures, to take Cadet Roh's sexual assault seriously and to lead him through recovery from the trauma that followed, that was the root cause of any such behavioral deficiency.

65.     On November 14, 2020, less than a week after being presented with the three overblown and largely baseless Class I charges set forth in Paragraphs 53 through 63 above, Cadet Roh confronted a female 2/c cadet for using Cadet Roh's skateboard to move a trunk, damaging the skateboard in the process.   Cadet Roh dressed down the 2/c in front of several peers and used profanity twice.

66.     The confrontation was initially handled by the cadet chain of command.  1/c Nathaniel Ralph, who was the Golf Company Department Head, verbally counseled Cadet Roh and issued a negative REGIS comment to document the incident.

67.     Defendant Inyang, however, had other plans.  Despite the fact that the matter had

been appropriately handled at the lowest level of leadership, Inyang charged Cadet Roh and found him guilty of a Class II offense and awarded him 30 demerits. The Commandant later ordered him to Respect Remediation. Cadet Roh was also ordered to provide a "plan to provide better leadership in his division by 29 January 2021" to Inyang. Cadet Roh did so.

68.     For her own part, the female 2/c repeatedly told Cadet Roh that she had never wanted anything to come of the incident other than an opportunity properly to apologize to him. She told Cadet Roh that she felt extremely guilty for what had befallen Cadet Roh after the incident, and was particularly upset to learn of the Class II charge two months after the fact.

69.     While the Constitution's Double Jeopardy Clause may not apply to administrative proceedings, the fact remains that Defendant Inyang deliberately, if not maliciously, resurrected this incident after it had already been fully and appropriately handled at the lowest level of leadership. One would assume that in an institution charged with leadership development, the manner in which cadet leadership promptly and effectively resolved the conflict should be encouraged and applauded. Thus, the fact that Defendant Inyang chose to subvert that sound leadership lesson by killing a fly with a 16-inch shell, over the objections of the perpetrator-turned-victim, serves only to illuminate, yet again, the personal vendetta and disenrollment campaign Inyang instituted during Cadet Roh's cadre summer, only three months after the sexual assault.

### 3723: Room or Locker in General Disorder (3 or More Particulars)

70.     This charge and the 8 demerits that resulted from it provide a telling example of the disparate treatment and reverse gender bias at the core of the targeted conduct campaign against Cadet Roh. On 27 February 2021, the Golf Company Commander, 1/c Catherine Galloway, conducted a Formal Room and Wing (FRAW) inspection, at which LT Inyang was present. Cadet Roh received a failing grade of 94/112; any grade below 99 can result in a

19

conduct offense.  He received that grade because 1/c Galloway either lied in her report or graded the inspection issues common to the room differently as between Cadet Roh and his roommate. The roommate received a perfect score for a windowsill that, as to Cadet Roh, was dusty.  The roommate received a perfect score for a waxed deck that, as to Cadet Roh, was "not waxed." The roommate received a perfect score despite having a locked lock box; Cadet Roh was penalized for his locked lock box.  Spotting a slight stain on Cadet Roh's desk, 1/c Galloway licked her finger, rubbed the spot for 20 seconds, looked at her finger, and proclaimed that Cadet Roh's desk was "dusty."  1/c Galloway claimed Cadet Roh's overhead locker was "disorganized."  After the inspection, Cadet Roh left his overhead locker untouched and had most of the first class in his company inspect it.  To a person, each concluded that the overhead locker was organized and neat.

71.     It bears repeating that Defendant Inyang was present throughout.  At one point, he flipped both roommates' racks to "check for sand," a breach of the COVID protocol in place at the time, which mandated that nothing in a room was to be touched during a FRAW.  The disheveled racks made a poor impression as to the rest of the inspection at least, that is, as to Cadet Roh's grade.

72.     1/c Galloway was a favorite of Inyang's.  About a month prior to graduation, she was masted after leaving campus and consuming alcohol at a bonfire.  Although she had to step down as GCC, she was not charged with an alcohol-related offense and graduated with the rest of her class.

73.     The facts of record clearly reflect that this charge was manufactured, in Defendant Inyang's presence and with his tacit approval, through disparate treatment and outright lying by a company commander who committed her own serious violations just weeks before graduation

but was given a pass by a company officer who obviously had his favorites.

***3101: Absence: unauthorized; 2203: Cadet regulations: flagrant violation of***

74.     These two charges together both arose from the same set of operative facts:  on the morning of 15 March 2021, Cadet Roh overslept as the result of recent sleep deprivation and a late night of catching up on school and military work.  A group project and other assignments had required immediate attention.

75.     The first charge was for missing a COVID test.

76.     The second charge is another example of Defendant Inyang's personal targeting of and retaliation against Cadet Roh.  Cadet regulations allow both male and female cadets to wear certain pierced jewelry when not in uniform.  Suffering from an infection in a pierced ear, Cadet Roh went to sleep the night before with a small stud in the piercing in an effort to prevent further infection.  Jolting awake after realizing he had slept through two alarms, Cadet Roh rushed to get into uniform and entered the passageway in the company area.  He then ran into Defendant Inyang and was discussing a matter with him when the company officer asked Cadet Roh what he had in his ear.  Cadet Roh immediately realized he had forgotten to remove the stud when he woke up, explained the ear infection situation, thanked Defendant Inyang for reminding him that the stud was still in, and removed it.  Inyang said "ok" and left it at that.

77.     The incident did not come up again for more than two weeks, during which Cadet Roh had any number of interactions with LT Inyang.  But at his second suitability for service meeting with the Assistant Commandant of Cadets, CDR Maureen Johnson, a meeting that was going well and was wrapping up, LT Inyang suddenly cut CDR Johnson off and asked Cadet Roh about the earring he had had in his ear two weeks prior.  Cadet Roh explained the circumstances regarding the infection, and most of the attendees accepted the explanation.  CDR Johnson and LT Inyang then asked if Cadet Roh understood the proscription against wearing

jewelry in uniform, and Cadet Roh responded that he did.  But because he could not recite the regulation from memory, CDR Johnson recommended that he look up the reg to understand fully what it said.

78.     Inyang, on the other hand, continued to question Cadet Roh about his knowledge of the reg, claiming that the reg proscribed the wearing of earring by a cadet at any time (which was wrong).  After the meeting, Inyang called a meeting with the Golf Company chief petty officer and Cadet Roh and informed Cadet Roh that he was charging him with a Class II offense because Cadet Roh knew the reg and had deliberately violated it.  He was then awarded 30 demerits for the offense.

79.     It was this 30 demerits that put Cadet Roh over the 150 limit for first class cadets.

80.     There exists no greater, no more glaring example, of Defendant Inyang's biased, unvarnished animus towards Cadet Roh, and of his determination to run Cadet Roh out of the Coast Guard Academy, than the charge related to the "earring incident."  Perhaps most damning is the fact that LT Inyang did nothing about it for two weeks until, in a suitability of service meeting with CDR Johnson and Cadet Roh, and after hearing CDR Johnson close the meeting by stating that "1/c Roh has 60 days left at USCGA and is on the right path," Inyang realized that he had to act swiftly and maliciously to drive Cadet Roh off of that path and out of the Academy, charging a minor, innocent mistake as a "flagrant" violation of regulations and arbitrarily awarding 30 demerits, knowing full-well that the number would put Cadet Roh over the top and seal his fate.

### *3101: Absence: Unauthorized; 3401: Duty: inattention, neglect, slow/careless to perform*

81.     The facts here provide another stunning example of gross overcharging under a set of circumstances that defies rational explanation.  On 22 April 2021, Cadet Roh was in

COVID isolation quarantine status in Munro Hall.  22 April was also the day of the class photograph for the Tide Rips Yearbook.  Despite his best efforts, Cadet Roh was unable to find a stand-in who would pose for the photograph, after which Cadet Roh's face would be photo-shopped in.

82.     The officer in charge of the evolution, LCDR Fowler, did not care about Cadet Roh's best efforts, nor did she care that his image still could have been photo-shopped into the group photo even in the absence of a stand-in.  She cited him for the two offenses above, and then made misrepresentations both to him and LT Inyang.  Another 1/c in isolation, Jasmine Rodriquez, had also failed to find a stand-in and was cited by LCDR Fowler for at least one conduct violation as a result.  Yet LCDR Fowler told Cadet Roh, with a copy to LT Inyang, that every other 1/c in isolation had managed to find a stand-in.  That statement was false.

83.     This rather ridiculous charge says nothing about Cadet Roh's character or suitability for service, but speaks volumes about the character of the officer who imposed the charge, given that she felt it necessary to lie to both Cadet Roh and Defendant Inyang in justifying the charge and the punishment imposed.

84.     Cadet Roh's roommate his last semester at the Coast Guard Aademy, ENS Tyler Dominick, sums up perfectly the targeted vendetta behind this avalanche of conduct charges in a statement he provided in support of Cadet Roh's appeal:

> Over the last semester I was Mr. Roh's roommate so I witnessed multiple interactions between him and the command staff. One thing I did notice was LT Inyang's expectation and standards for Mr. Roh was much higher than everyone else. For example, during the formal room and wing, Mr. Roh was marked lower than me on shared spaces such as the condition of the deck, dust, and window sill. This discriminatory treatment resulted in Mr. Roh receiving a failing score resulting in a re-inspection. Also, Mr. Roh would be constantly targeted by the command as they would regularly come by the room to see what Mr. Roh was up to which was more times than I have seen any other year at the academy. During the

online class atmosphere, this was shown to be very distracting for Mr. Roh which resulted in Mr. Roh having a harder time to complete work. This extra attention from command induced more unnecessary stress on him. With command's constant checks of Mr. Roh, they naturally were able to find multiple minor discrepancies and had awarded him with numerous demerits. These demerits is why Mr. Roh has been put up for disenrollment. From the view as Mr. Roh's roommate, it seemed like command had a personal vendetta toward Mr. Roh and wanted to make sure he was unable to graduate. There seemed to be no sympathy or concern from command for Mr. Roh's well-being which seemed unacceptable especially since he was a sexual assault victim.

***Another Glaring Example of Defendant Inyang's Personal Vendetta Against Cadet Roh***

85.     Presented here for comparison – and to illustrate the wrongful undue influence Defendant Inyang exerted in his efforts to disparage and destroy Cadet Roh – are three Cadet Evaluation Reports (CER), copies of which are attached as Exhibit B.  Two of the CER's pointedly illustrate the kind of exemplary performance Cadet Roh has repeatedly exhibited during his time at the Academy as well as his suitability for service.  The department head who wrote the third CER, covering Cadet Roh's last semester at the Academy, was ***ordered*** by Defendant Inyang to change her comparison scale to "Unsatisfactory," a comparison that stood in stark contrast to the "One of few distinguished cadets" and "One of the many high performing cadets who form the majority of this grade" Cadet Roh had received in the two earlier CER's.

86.     The first review covers Cadet Roh's summer training in the Fleet from 22 June to 14 August 2020.  The review includes the following comments, some of which reflect added emphasis:

> ***Superb effort*** in obtaining [Operations Duty Officer] qualification, assisted peers and held them to the same high standard, coordinated ODO schedule to ensure full coverage of assigned SAR and LE duties; resulted in same completion of 30 sorties & over 70 flight hours.  ***Excellent execution*** of 05 SAR cases, initiated rapid aircraft launches & command briefings, all information accurate and timely.  Member was able to adapt to changing severe weather conditions, mission priorities, and command objectives; efforts resulted in 04 lives saved or assisted.  Sought out and

volunteered for additional projects, led effort in reconfiguring misused building space. . . . Member was a ***great asset*** to the unit over the course of the summer program, ***efforts were directly tied to operational successes as well as lasting unit improvements***; look forward to their future contributions in the fleet.

***Exceptional cadet*** who performed very well this summer in the role of a junior officer at Air Station Clearwater.  Always eager to assist & volunteered for significant projects; made positive impact on the unit. Rapidly qualified as ODO, a task heavy & complicated duty normally stood by experienced petty officer/officers.  1/c Roh ***will undoubtedly be successful in any role as a junior officer in the CG.  Highest recommendation*** for flight training immediately after graduation.

Comparison scale:  One of few distinguished cadets

Every numerical rating under Section 3 was either a 6 or a 7 (7 is highest)

87.    The second review covers Cadet Roh's Fall 2020 semester, from 17 August to 20 November 2020.  The review includes the following comments, some of which again reflect added emphasis:

MBR has exhibited ***extreme dedication*** to the maintenance of MBR's health and well-being through numerous physical and recreational activities that MBR participates in, leading to the MBR ***exceeding the expectation*** set forth for cadets during the semester physical fitness exam. MBR has ***exhibited selflessness*** by volunteering to help other divisions in the company, ***going out of MBR's way*** to perform collaterals that is [sic] not assigned to MBR.  MBR has acted as a ***mentor to others*** throughout the company, providing guidance and advice in the professional development of others throughout the company.  MBR is performing at a ***level expected of a first class cadet***, but should look to further develop MBR's self to better prepare to become an Ensign after graduation.

Comparison scale:  One of many high performing cadets who form the majority of this grade

The numerical ratings under Section 3 ranged from 4 to 7

88.    As noted above, the third review covers Cadet Roh's final semester at the Academy, from 4 January to 16 April.  The review includes the following comments, some of which reflect added emphasis:

MBR did work ***beyond a cadet level*** that could benefit the Coast Guard as a whole.

MBR actively looked for opportunities to assist those around him with their struggles and acted as a ***positive role model for underclassmen*** despite challenges MBR faced.

1/c Roh assumed the role of Aviation Division Officer responsible for the leadership development of six underclassman/women.  Empowered subordinates to take charge of the division and execute the duties.  1/c Roh made gradual progress in internalizing the CG core values of Honor Respect and Devotion to Duty.  Mbr had made ***great personal growth*** and continues to strive to become a leader of character.

The numerical ratings under Section 3 ranged from 3 to 6.

89.     Yet despite the positive comments (the latter of which were written by LT Inyang himself), despite the numerical ratings that clearly placed Cadet Roh at least in the "One of many high performing cadets who form the majority of this grade" comparison scale, a comparison the rater, 1/c Kaitlyn Mooney believed was justified, LT Inyang overrode 1/c Mooney and ordered her to give Cadet Roh an "Unsatisfactory" on the comparison.

***The Creation of a Pejorative and Disparaging Narrative at the Hands of Defendant Inyang and Others***

90.     While Cadet Roh was legally precluded from talking about what had happened to him at the hands of Clancy, others at the Academy felt no such constraints.

91.     As set forth throughout this submission, LT Inyang was the chief creator of the "emotional regulation and professional interactions" narrative, one of the two bases cited by the Superintendent as warranting disenrollment.  That narrative began as early as the end of Cadet Roh's third class year, just one month after the sexual assault.  On a 3/c Cadet Record Review Worksheet, a copy of which we attach as Exhibit C, Defendant Inyang falsely stated that Cadet Roh was in alcohol remediation, falsely stated that Cadet Roh was at 50% of his demerits limits his fourth and third class years  (when, in fact, Cadet Roh had been awarded a mere 15 and 17

26

demerits, respectively), and, worst of all, recommended Cadet Roh for suitability for service probation, the first step towards disenrollment.

92.     It was Defendant Inyang who attempted to convince a cadet to charge Cadet Roh with assault because his phone bounced off of a rack and lightly grazed her.  It was Inyang who ordered a cadet rater to rate Cadet Roh's performance as "unsatisfactory."  It was Inyang who interrupted a positive suitability-for-service meeting between the new Assistant Commandant and Cadet Roh about the "earring incident" and then charged Cadet Roh with a "flagrant" violation of cadet regulations, assigning a number of demerits that put Cadet Roh over the limit for his first class year.  It was Inyang who stood by and watched while Cadet Roh's company commander disparately treated Cadet Roh in a FRAW room inspection and lied about some of the bases for failing him.  All of this coming from a supposed leader who did absolutely nothing to ensure that a young cadet with exceptional potential for leadership in the Fleet was not left to see that potential irreparably crippled in a horrific sexual assault by a psychologically-disturbed cadet who never should have been at the Coast Guard Academy in the first place.

93.     For his own part, and in blatant violation of his MPO, 2/c Clancy repeatedly approached Cadet Roh in an effort to convince him not to cooperate with investigators or prosecutors.  That of course, is also obstruction of justice.  In addition, 2/c Clancy engaged in gaslighting of his own, spreading rumors about what had really transpired the night of 13 April 2019, causing wild rumors to spread that Cadet Roh had attempted to kill his assailant, that Cadet Roh himself was the assailant, and that Cadet Roh was part of a blood cult and that the incident was a ritual gone wrong.

94.     As aptly noted in a statement submitted by one of Cadet Roh's classmates, ENS Heather Miller,

False rumors were spread of [Josh] by people who did not know all of the details in which he was involved.  In result, many people believed him to be a temperamental and angry person.  He has been outcasted by other cadets and his word has been invalidated due to the perception that these rumors depicted.  This is unfair and has caused great hardship to a person who always had good intentions, and truly made an impact in more people's lives than others may know.

95.    That Cadet Roh's voice was taken away from him by way of this rumor-mongering is, as further set forth below, antithetical to the core principles of the Coast Guard's SAPR Program.

***The Command Failed to Respond to Cadet Roh's Unrestricted SAPR Complaint, In Violation of Applicable Coast Guard Regulations***

96.    Cadet Roh submitted a personal statement submitted in support of his appeal.  The statement was open and candid, deeply heartfelt, expressive of unimaginable pain and, perhaps more than anything else, profoundly sad.  At one point, Cadet Roh explained that the Command's failure to recognize the continued threat 2/c Clancy posed to him and others terrified him and left him feeling incredibly vulnerable.  He then went on to state that it

added an incredible amount of stress and anxiety to an already volatile situation.  I also learned that I could not trust those in charge to advocate for me and place protective measures in place to help me effectively process the trauma I endured in a healthy way.  Due to all of this I found myself having symptoms of insomnia and would rarely sleep more than an hour unless I could sleep during the day with the door locked.  The only times I could sleep were when I had thoroughly exhausted myself which became harder and harder to do.  All of this, the lack of sleep, the feeling that I had to always be on guard, the knowledge that I was in this alone, all led to physiological changes in me.  I started losing weight.  I was having a hard time concentrating and staying on task.  My hair started falling out.  I found myself erupting in anger at the smallest slights.  I was fighting a war and had no allies.

97.    Cadet Roh painted, in brutally honest terms, a picture of a young man of great promise emotionally and psychologically broken, and then vilified and abandoned by a Command who quite clearly was of the view that real men don't get sexually assaulted and that,

28

even if they do, are supposed to "man up" and power through it.  It is inconceivable that any

such sentiment could ever be expressed to a female victim of sexual assault.  If it were, the

supervisor responsible would promptly be cashiered out of the service.

98.     The Command failed to provide any meaningful recovery from the assault as

mandated by the SAPR Instruction and Strategic Plan.

99.     The Coast Guard has promulgated comprehensive instructions governing it's

SAPR Program.  Chief among these instructions is *Sexual Assault Prevention and Response*

*(SAPR) Program*, COMDTINST 1754.10E.

100.    Defendant Kelly could not possibly have any excuse for not knowing this

instruction cover-to-cover.  He was the senior officer who issued it while serving as Assistant

Commandant for Human Resources.

101.    The Instruction sets forth mandatory steps and services the Coast Guard Academy

was required to provide to Cadet Roh after he filed his unrestricted report.  As the Instruction

makes clear at the outset, "The policies in this Manual Cover prevention and response

requirements that personnel must understand in order to stop offenders ***and care for victims***.

The SAPR Program focuses on prevention strategies, ***supporting victim recovery***, and ***assisting***

***service member victims to be fully mission capable and engaged***."

102.    Key mandates of the Instruction include the following:

    a.  Providing the victim a Special Victims' Counsel (SVC)

    b.  Immediately, upon receipt of an unrestricted report, providing victim

        assistance through a Sexual Assault Response Coordinator (SARC),

        including

        i.  Assigning the victim the services of a Victim's Advocate (VA) for

an initial meeting

    ii.   Advising the victim of the availability of an SVC and explaining the actions an SVC can take on the victim's behalf

    iii.  Providing initial crisis intervention and sexual assault information and handouts to victims and secondary victims (e.g., families, significant others, friends)

   c.  Ensuring that command health care providers (HCPs) see to it that the victim is provided psychiatric care and counseling

   d.  Protecting the victim's privacy

   e.  Issuing a military protective order (MPO), and

   f.  Providing an update to the victim within 72 hours of a SAPR Crisis Intervention Team (CIT) Meeting

103.    The Instruction directs Commands with Victims to use the "Unit Commander's Checklist for Unrestricted Reports of Sexual Assault."

104.    The Coast Guard's *Sexual Assault Prevention, Response, and Recovery Strategic Plan 2018-2022* lists "Recovery" as Goal 4 of the Plan and, to that end, states in pertinent part, "The Coast Guard must **maintain the privacy and dignity of the victim** while offering a broad complementary system of medical, **behavioral care**, legal services and administrative support that empowers victims to have a voice during their **path to recovery**, while preserving military readiness."

105.    The Command's execution of these mandates ranged from pathetic to non-existent. While going through the motions of assigning an SVC and setting up an initial meeting with the SARC, the Command did nothing to offer a "broad complementary system of medical,

behavioral care, legal services and administrative support." No effort was made by command health care providers (HCPs) to "***see to it*** that [Cadet Roh] [wa]s provided psychiatric care and counseling." The SARC merely gave a Cadet Roh a short list of potential counseling services that included the command chaplain's office and a short list of others. Compounding this failure was the comment by one senior member of the Command during cadre summer directing Cadet Roh to "Get a mental health evaluation for yourself or we will make you get one." That is a threat, not an offer of help, and it flies in the face of the SARP Instruction and Strategic Plan.

106.    The total meaningful assistance provided by Cadet Roh's SVC's, neither of whom was resident at the Academy, may be summed up in an e-mail his second SVC sent to him on 25 June 2020, simply asking, "On an unrelated note, are you doing ok? Do you need anything that you're not currently getting? I hope you're having a great week." That is the assistance that falls on the "pathetic" side of the scale.

107.    As for the requirement to keep Cadet Roh advised of developments in the criminal investigation, such advice went from sporadic while the investigation was on-going to radio silence once the investigation concluded. Cadet Roh had little to no idea whether 2/c Clancy was being court-martialed, administratively separated, or simply permitted to remain at the Academy.

108.    Finally, the Command did nothing to protect Cadet Roh's privacy. It did nothing to squelch the wild rumors circulating about the events of 13 April 2019.

109.    These failures stand in stark contrast to the Coast Guard Academy Command's response to reports of sexual assaults by female cadets, responses ranging from a year-long sabbatical to paying for private, out-of-state counseling services.

110.    These failures were all the more egregious and indefensible give the extent to

which members of Cadet Roh's chain of command were aware of the deleterious and sustained impact the assault had on his well-being and his ability to meet the academic and military performance challenges with which he was daily confronted. Cadet Roh's chain of command did virtually nothing to provide him with resources or to rehabilitate him. The chain of command did nothing to discharge its mandatory duties under the SAPR instructions. Instead, each of Cadet Roh's encounters with his chain of command, driven by overblown, overcharged, and sometimes baseless conduct violations they had put into the system, and Cadet Roh's pleas for mitigation, understanding, and help were met with dismissive observations that everyone has problems and that apparently Cadet Roh was the only person in the Corps of Cadets who could not handle his. This Pilate-like handwashing would prove particularly ironic were the Command now to maintain that Cadet Roh should be disenrolled because he has failed to "own it."

111.    If the Coast Guard Academy wants cadets to "own it," the Command should show them how to do it.

112.    The Superintendent, the Commandant, the former Assistant Commandant, and LT Inyang have all consistently viewed the manifestations of Cadet Roh's post-assault trauma as a character defect Cadet Roh has insufficiently failed to correct, rather than a legitimate response to a horrific event the Command itself has, despite the clear mandates of its own regulations, failed to address and remedy. Simply stated, the Command does not view Cadet Roh as a victim. And the reason it does not is because the all-male locker room mentality that dominates its culture willingly confers victim status on female cadets because it views them as naturally and inherently weak and thus in need of traditional male protection. These same macho males would never, however, confer such victim status on younger males because to do so would run counter to all of their ingrained, biased notions of "being a man."

113.    A prime example of precisely this dynamic is the skateboard incident.  Although the clear perpetrator in the incident was a female cadet, she quickly became the victim, and Cadet Roh became the aggressor.  All focus was on the female cadet's emotions:  Cadet Roh's failure to "take pity" on her after she initially apologized, and her assertion in the statement she later submitted to the Golf Company XO that the incident was "the only time as a cadet that she has felt unsafe at the Coast Guard Academy."  Meanwhile, since the sexual assault, Cadet Roh had ***never*** felt safe at the Coast Guard Academy, but no one either believed it or cared about it.

114.    Thus, while, in the name of diversity, inclusion, and "cracking down" on sexual assault and sexual harassment, the Command bends over backwards to accord female cadets unconditional acceptance of their allegations, wide leeway as to their own misconduct, and repeated forgiveness of performance shortfalls -- all of which come with victim status -- male cadets who invoke similar challenges are viewed as willful, substandard performers who have bad attitudes and are simply not "owning it."  Such bias mirrors the public bias underpinning the notion that "'real men' cannot be sexually victimized."  This prejudicial undercurrent pervades the chain of command's separation recommendation.

115.    Nor can there be any doubt that such bias was all the more pernicious given its unequivocally retaliatory aspect.  It is difficult, if not impossible, to reconcile the CER's Cadet Roh received during his 2020 summer training and Fall 2020 semester with the "Unsatisfactory" comparison scale Defendant Inyang insisted on giving him, and ordered the primary rater to give him, for his last semester.  Indeed, even as to the third evaluation, the "Unsatisfactory" comparison scale cannot be squared with the narrative comments and numerical ratings.

116.    The only plausible explanation is that Inyang, consistent with his Spring semester demerits campaign, deliberately downgraded Cadet Roh's performance to make the case for

disenrollment, part and parcel of the pejorative narrative and toxic company environment designed to ensure Cadet Roh would be viewed as unsuitable for service.  As is clear from Cadet Roh's Summer Training CER, in a realistic military environment free of Inyang's toxic, undue influence, Cadet Roh thrived, and his performance was nothing short of superlative.  Surely there was no greater indicator of Cadet Roh's suitability for service than a stellar CER from an unbiased line officer in an operational command.

### *The Cronyism at the Highest Levels of the Coast Guard Command Made It Impossible for Cadet Roh to Receive a Fair Hearing of His Appeal*

117.    Defendant Kelly and Defendant Nunan are Coast Guard Academy classmates, Class of 1987.  As noted above, Defendant Kelly was formerly the Assistant Commandant of the Coast Guard for Human Resources.  Defendant Nunan replaced Defendant Kelly in that position, and Kelly became Superintendent of the Coast Guard Academy.

118.    When Defendant Kelly called Cadet Roh into his office on May 11 to advise that he was recommending Cadet Roh's disenrollment, the Deputy Commandant for Mission Support-Deputy for Personnel Readiness (DCMS-DPR) was Vice Admiral Paul Thomas, Coast Guard Academy Class of 1985.  Knowing that he was about to be promoted, Thomas sat on Cadet Roh's appeal until Defendant Nunan replaced him in that position.

119.    Thomas, who now runs the Coast Guard's Mission Support organization, now directly reports to one of his own Coast Guard Academy classmates, Admiral Linda Fagan. Fagan is the Vice Commandant of the Coast Guard, the number two ranking admiral in the Coast Guard hierarchy.

120.    In the face of these interlocking, close-knit relationships, Cadet Roh's appeal was dead on arrival, first on Vice Admiral Thomas' desk, and then on Rear Admiral Nunan's desk. Indeed, and as set forth above, Cadet Roh's supplemental appeal was denied, without

explanation, one day after it was transmitted to Defendant Nunan's office.

## COUNT 1
### (Violation of the Administrative Procedure Act)

121.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

122.    Defendants' actions constitute numerous, material violations of federal statutes and the Coast Guard's own regulations governing its Sexual Assault Prevention and Response (SAPR) Program.

123.    Defendants failed to provide any reasons or bases for the denial of Plaintiff's appeal.

124.    Defendants' decision to disenroll Cadet Roh and to deny his appeal constitute final agency actions that violate the APA because they are arbitrary and capricious, abuses of discretion, not in accordance with law, and contrary to the Due Process Equal Protection provisions of the Fifth Amendment to the U.S. Constitution.

125.    This Court has the authority to review these actions under 5 U.S.C. § 702 and to enjoin and overturn them in accordance with 5 U.S.C. § 706(2)(A) and (B).

126.    The agency violations and actions at issue here are final because the harm to Plaintiff caused by these violations and actions is immediate, continuing, and irreparable.  Other than the declaratory and injunctive relief requested, there exists no adequate remedy at law.

## COUNT 2
### (Deprivation of Procedural Due Process in Violation of the Fifth Amendment to the U.S. Constitution)

127.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

128.    Fundamental to the procedural due process protections afforded by the Fifth Amendment is the right to "notice and an opportunity to be heard . . . at a meaningful time and in a meaningful manner." *Hamdi v. Rumsfeld*, 542 U.S. 507, 596 (2004) (internal quotes and

citation omitted).

129.    Cadet Roh, who has now been reduced to the rating of BM3 and has been dispatched to a Coast Guard base in Portsmouth, New Hampshire, will be required to serve in an enlisted status for the next four years, a clear liberty interest.

130.    The allegations set forth throughout this Complaint make clear that the Defendants Inyang, Ray, and Kelly deprived Plaintiff of even the most basic notions of fundamental fairness in the creation of a false narrative designed to cover up their own abject failures meaningfully to respond to Cadet Roh's sexual assault and drive Cadet Roh out of the Coast Guard Academy. Those pernicious efforts were accompanied and reinforced by a series of trumped up and overblown administrative conduct charges and an adjudicative process that was little more than an exercise in confirmation bias and, at bottom, a total sham.

131.    Moreover, one of the two purported bases for Plainitff's disenrollment – the so-called "continued concern regarding [Cadet Roh's] deficiencies in emotional regulation and professional interactions" is not a standard of conduct to be found in any Coast Guard or Coast Guard Academy Regulation and is nothing more than a pretext of which Plainitiff had no meaningful notice.

132.    Defendants Shultz, Nunan, and Kelly rendered Plaintiff's appeal process meaningless, giving absolutely no consideration to his appeal or supplemental appeal, and providing no reasons or bases for their summary denial.

133.    The agency actions and constitutional violations at issue here are final because the harm to Plaintiff caused by these violations and actions is immediate, continuing, and irreparable. Other than the declaratory and injunctive relief requested, there exists no adequate remedy at law.

## COUNT 3
## (Deprivation of Substantive Due Process in Violation of the Fifth Amendment to the U.S. Constitution)

134.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

135.     Substantive due process protections serve as an absolute check on certain governmental actions where the resulting deprivation of life, liberty, or property is so unjust that no amount of fair procedure can rectify it.

136.     Cadet Roh, who has now been reduced to the rating of BM3 and has been dispatched to a Coast Guard base in Portsmouth, New Hampshire, will be required to serve in an enlisted status for the next four years, a clear liberty interest.

137.     The actions of the Defendants were not only grossly arbitrary and capricious, they were so ***retaliatory, intentional, and deliberate*** as to shock the conscience.  Defendants and their agents engaged in a deliberate course of action to punish and disenroll Cadet Roh as a means of covering up Cadet Roh's sexual assault and their own failure meaningfully to respond to it.

138.     Defendants' actions were the product of unconstitutional, anti-male stereotyping and bias.

139.     Defendants' deliberate and intentional acts have deprived Plaintiff the fundamental liberty interests enumerated throughout this Complaint.

140.     The agency actions and violations at issue here are final because the harm to Plaintiff caused by these violations and actions is immediate, continuing, and irreparable.  Other than the declaratory and injunctive relief requested, there exists no adequate remedy at law.

**COUNT 4**
**(Deprivation of Equal Protection in Violation of the Fifth Amendment to the U.S. Constitution)**

141.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

142.    The grossly disparate treatment Plaintiff has received at the hands of the Defendants is directly attributable to his gender.  Rather than discharging its regulatory obligations under the Coast Guard's SAPR and other regulations, Defendants ignored the psychological and emotional trauma Plaintiff suffer because "real men don't get sexually assaulted."

143.    This grossly disparate and discriminatory treatment violates Plaintiff's rights under the Equal Protection principles federal courts have recognized under the Fifth Amendment.

144.    The agency actions and violations at issue here are final because the harm to Plaintiff caused by these violations and actions is immediate, continuing, and irreparable.  Other than the declaratory and injunctive relief requested, there exists no adequate remedy at law.

**COUNT 5**
**(Violation of the Military Whistleblower Protection Act, 10 U.S.C. § 1034)**

145.    Plaintiff incorporated the preceding paragraphs as if fully set forth below.

146.    Plaintiff's unrestricted SAPR report reporting his sexual assault was a protected communication under Sections (b)(B) (iii), (iv), and (vi) of the Military Whistleblower Protection Act (MWPA).

147.    Plaintiff's anonymous, confidential submission to the Defense Equal Opportunity Climate Survey was a protected communication under Section (b)(B)(iii) the MWPA.

148.    Defendants' adverse actions and inactions as fully set forth above were intended to, and did, retaliate against Plaintiff in violation of the MWPA.

149.     The agency actions and violations at issue here are final because the harm to Plaintiff caused by these violations and actions is immediate, continuing, and irreparable.  Other than the declaratory and injunctive relief requested, there exists no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff seeks an order and judgment to

    a.  Declare that Defendants impermissibly discriminated against BM3 Roh based on his gender in violation of the Fifth Amendment;

    b.  Declare that Defendants deprived BM3 Roh of his procedural due process, substantive due process, and equal protection rights under the Fifth Amendment;

    c.  Declare that Defendants unlawfully retaliated against Plaintiff in violation of the MWPA;

    d.  Reverse Defendants' disenrollment of Plaintiff from the Coast Guard Academy and order that he be graduated and commissioned;

    e.  Award Plaintiff his attorneys' fees under the Equal Access to Justice Act; and

    f.  Award all other relief that the Court deems just and proper.

Dated: October 1, 2021                          Respectfully submitted,

                                        _____/s/_ Jeffrey E. McFadden_____
                                        Jeffrey E. McFadden
                                        (DC. Bar No. 434234)
                                        LAW OFFICES OF JEFFREY E. MCFADDEN, LLC
                                        312 Prospect Bay Drive East
                                        Grasonville, MD 21638
                                        (410) 490-1163
                                        jmcfadden@jmcfaddenlaw.com

                                        *Counsel for Plaintiff*