UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSHUA DILLON ROH,<br><br>        Plaintiff,<br><br>        v.<br><br>KARL L. SCHULTZ, *in his official capacity as Commandant of the U.S. Coast Guard*, *et al.*,<br><br>        Defendants. | Civil Action No. 21-2560 (BAH)<br><br>Chief Judge Beryl A. Howell |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Joshua Dillon Roh, a Nebraska resident who, in May 2021, was dismissed from the United States Coast Guard Academy ("Academy") in New London, Connecticut, brings this action against three Coast Guard officials stationed at the Academy, as well as two high-ranking Coast Guard members located in Washington D.C., alleging violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, his Fifth Amendment equal protection and due process rights, and the Military Whistleblower Protection Act, 10 U.S.C § 1034(b).  Compl. ¶¶ 3, 11, ECF No. 1.  The gravamen of plaintiff's complaint is that his dismissal from the Academy was based on retaliation and defendants' desire to cover up "institutional failures" and "repeated violations of law" after they denied plaintiff adequate support and disregarded Coast Guard policy following his reporting of a sexual assault perpetrated at the Academy by another male cadet—all which conduct is alleged to have occurred in Connecticut.  *See id.*  ¶¶ 3-4.  Defendants seek transfer of this case to the District of Connecticut pursuant to 28 U.S.C. § 1404(a).  Defs.' Mot. to Transfer ("Defs.' Mot."), at 1, ECF No. 13.  As explained below, defendants' motion is granted.

1

I.  **BACKGROUND**

A brief overview of plaintiff's factual allegations is followed by discussion of the relevant procedural history.

**A. Factual Background**

Plaintiff, a 22-year-old resident of Lincoln, Nebraska, was enrolled as a cadet at the Academy until his dismissal in May 2021. Compl. ¶¶ 1-2, 12, 21. About two years earlier, on April 23, 2019, plaintiff was sexually assaulted by another male cadet in his dorm room at the Academy's New London campus. *Id.* ¶¶ 30, 33. Following this traumatic incident, plaintiff— fearful about reencountering his assaulter—filed a Sexual Assault Prevention and Response ("SAPR") report with the Academy's campus Sexual Assault Response Coordinator, expecting that by doing so Academy staff "would protect him, take care of him, and assist him in recovering from the trauma he had just suffered," *id.* ¶ 35, consistent with the SAPR policy directive to "support[] victim recovery, and assist[] service member victims to be fully mission capable and engaged," *id.* ¶¶ 99, 101. Plaintiff was interviewed by two Coast Guard Investigative Service agents six days after the assault. *Id.* ¶ 36. Only weeks later, however, was a military protective order issued against the assault perpetrator, whom plaintiff "was forced to see . . . over and over again because the two shared the same major and the same classes." *Id.*

As a result of the trauma stemming from his assault and continued encounters with his assailant around campus, plaintiff began exhibiting "behavioral issues [that] were directly attributable to the [Academy's] abject failure to follow its own SAPR regulations and to treat [plaintiff's] post-traumatic stress." *Id.* ¶ 42; *see also id.* ¶ 110 ("[Plaintiff's] chain of command did virtually nothing to provide him with resources[,] to rehabilitate him" or "to discharge its mandatory duties under the SAPR [policy]."). Nevertheless, plaintiff avers that thereafter

Academy staff—specifically defendant Lieutenant Akaninyene Inyang, plaintiff's company officer—"turned that failure on its head, blaming [plaintiff] for failing to 'suck it up' and 'get over' his assault." *Id.* ¶ 42; *see also id.* ¶ 5 ("[Plaintiff's] efforts to call attention to, and seek help for, the debilitating trauma he suffered as the result of a sexual assault, served only to put a retaliatory target on his back."). Inyang and other members of the regimental staff "treated [plaintiff] as though he was not in his right mind," *id.* ¶ 41, and began to cite plaintiff for "trumped-up" misconduct and other alleged disciplinary infractions following a variety of incidents at the Academy, *id.* ¶¶ 44-46.

Altogether, plaintiff alleges that, of 75 disciplinary demerits he received after being assaulted, 60 of those demerits were "attributable to alleged outbursts or loss of temper directly related to [his] untreated post-sexual assault trauma" and to a "targeted campaign of harassment and retaliation against [him as] a male who was failing to demonstrate to the Academy's locker-room mentality that he was a 'real man.'" *Id.* ¶¶ 50-51; *see also id.* ¶¶ 57, 64, 70, 76-77, 80, 82-83, 85, 93 (describing myriad demerits and other disciplinary charges that plaintiff alleges were issued against him because of retaliatory and discriminatory animus after reporting he was assaulted by another male cadet). This record, in plaintiff's view, also reflected "the personal vendetta and disenrollment campaign Inyang instituted [against him] only three months after the sexual assault." *Id.* ¶ 69. Plaintiff asserts that the institutional response to his reporting of sexual assault "stand[s] in stark contrast to the [Academy's] response to reports of sexual assaults by female cadets, . . . ranging from a year-long sabbatical to paying for private, out-of-state counseling services." *Id.* ¶ 109; *id.* ¶ 114 (further alleging that, "in the name of diversity, inclusion and 'cracking down' on sexual assault and sexual harassment, the [Academy] bends backwards to accord female cadets unconditional acceptance of their allegations . . . [while] male

cadets who invoke similar challenges are viewed as willful, substandard performers who have bad attitudes and are simply not 'owning it.'"). For this reason, plaintiff maintains that defendants "Superintendent [William G. Kelly] . . . Commandant [Arthur L. Ray], . . . and LT Inyang," who were all stationed at the Academy, failed to properly respond to his sexual assault report because of gender bias and retaliatory animus against him as a male victim. *Id.* ¶¶ 112, 114, 116.

On May 11, 2021, eight days before he was scheduled to graduate from the Academy, plaintiff was summoned to the office of Superintendent Kelly, who announced plaintiff's dismissal from the Academy because he had accrued more than the maximum allowable demerits resulting from a "pattern of misconduct" and given "continued concern regarding [plaintiff's] deficiencies in emotional regulation and professional interactions." *Id.* ¶ 3. Plaintiff sought reconsideration, but Kelly reaffirmed his disenrollment decision days later. *Id.* ¶ 8. On July 15, 2021, defendant Rear Admiral Joanna M. Nunan, who is stationed in Washington D.C. and has final authority regarding disenrollment appeals, rejected plaintiff's appeal of his dismissal from the Academy. *Id.* ¶ 9; *id.,* Ex. A, Appeal of Disenrollment. Denial of this appeal is the only action relevant to plaintiff's claims that is alleged to have taken place in Washington D.C. Following his dismissal from the Academy, plaintiff was reduced in rank and is currently serving in an enlisted status at a Coast Guard base in Portsmouth, New Hampshire. *Id.* ¶ 136.

B.  **Procedural Background**

Plaintiff commenced this lawsuit on October 1, 2021. *See generally* Compl. Following an extension of time to answer or otherwise respond to plaintiff's complaint, *see* Min. Order (Feb. 11, 2022), on March 15, 2022, defendants moved to transfer this action to the District of Connecticut. *See* Defs.' Mot.

Across five counts, plaintiff claims that: (1) defendants' decision to disenroll him and deny his appeal was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA, Compl. ¶¶ 121-126; (2) defendants deprived him "of even the most basic notions of fundamental fairness in the creation of a false narrative designed to cover up their own abject failures meaningfully to respond to [his] sexual assault and [to] drive [him] out of the . . . Academy," *id.* ¶ 130, in violation of his procedural due process rights under the Fifth Amendment, *id.* ¶¶ 127-133; (3) defendants' deliberate and intentional acts to punish and disenroll plaintiff in an attempt to cover up his sexual assault and their failure to respond to it deprived plaintiff of fundamental liberty interests, in violation of the Fifth Amendment's substantive due process guarantee, *id.* ¶¶ 134-140; (4) gender discrimination, in violation of the Fifth Amendment's equal protection guarantee, *id.* ¶¶ 141-144; and (5) retaliation, in violation of the Military Whistleblower Protection Act ("MWPA"), 10 U.S.C. § 1034(b), *id.* ¶¶ 145-149. On these claims, plaintiff seeks declaratory judgment and an injunction reversing his disenrollment from the Academy, in addition to attorneys' fees and any other relief the Court deems proper. *Id.* at 39. Defendants' motion to transfer is ripe for resolution.

## II.   LEGAL STANDARD

District courts have discretion to transfer a case to another proper venue "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). Under the general venue statute, venue is proper in any judicial district where: (1) "any defendant resides, if all defendants are residents of the State in which the district is located;" (2) "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;" or (3) "any defendant is subject to the court's personal

jurisdiction with respect to such action," "if there is no district in which an action may otherwise be brought as provided in this section." 28 U.S.C. § 1391(b).

The Supreme Court has explained that "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org. Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)). In resolving motions to transfer venue under § 1404(a), a district court "must evaluate both the convenience of the parties and various public-interest considerations . . . [and] weigh the relevant factors and decide whether, on balance, a transfer would serve 'the convenience of parties and witnesses' and otherwise promote 'the interest of justice.'" *Atl. Marine Const. Co. v. United States Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 62-63 (2016) (footnote omitted) (quoting § 28 U.S.C. 1404(a)). This assessment focuses on whether the presumption in favor of plaintiff's choice of forum is overcome by consideration of all relevant public- and private-interest factors indicating that the alternative forum is more convenient and better serves the interest of justice for resolution of the merits. *See Van Dusen*, 376 U.S. at 634 ("Congress, in passing [§] 1404(a), was primarily concerned with the problems arising where, despite the propriety of the plaintiff's venue selection, the chosen forum was an inconvenient one."). The movant bears the burden of persuasion that transfer of an action is proper. *SEC v. Savoy Industries, Inc.*, 587 F.2d 1149, 1154 (D.C. Cir. 1978).

## III. DISCUSSION

The first step to resolve a motion to transfer venue under § 1404(a) is determining whether the proposed transferee district is one where the action "might have been brought." 28 U.S.C. § 1404(a); *Atl. Marine Constr. Co.*, 571 U.S. at 52. In actions that raise a federal question

by naming as a defendant a federal agency or United States official in his or her official capacity, venue is proper in any judicial district where: (1) "a defendant in the action resides;" (2) "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is subject of the action is situated;" or (3) a "plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). Here, plaintiff is a resident of Nebraska, Compl. ¶ 12, and challenges actions that primarily occurred in Connecticut, which is where three out of the five defendants reside and the Academy is located, *see generally id*. Plaintiff's "behavior for which he was disenrolled, the decision to disenroll him, and the Coast Guard's first affirmance of that decision" all took place in Connecticut. Defs.' Mot. at 3-4. Defendants are thus correct that this action "might have been brought" in the proposed transferee district. *Id.* at 4; 28 U.S.C. § 1404(a). Having cleared that threshold hurdle, consideration of which forum best serves the convenience of the parties and witnesses and the interest of justice is the focus of the remainder of this discussion. *See* 28 U.S.C. § 1404(a).

In resolving motions to transfer venue under § 1404(a), courts do not limit their consideration to the express statutory factors of "convenience of parties and witnesses," 28 U.S.C. § 1404(a)(1), but also examine several private- and public-interest factors which serve to elucidate the concerns implicated by the phrase "in the interest of justice." *See*, *e.g.*, *Stewart Org.*, 487 U.S. at 29 (noting that motion to transfer under this statute "calls on the district court to weigh in the balance a number of case-specific factors"). This analysis must guard against "the danger that a plaintiff might manufacture venue in the District of Columbia . . . [b]y naming high government officials as defendants." *Cameron v. Thornburgh*, 983 F.2d 253, 256 (D.C. Cir. 1993). The mere presence of high-level officials in this District who "ultimately oversee all

7

agency activities . . . is [thus] insufficient to favor venue in the District of Columbia." *W. Watersheds Project v. Pool*, 942 F. Supp. 2d 93, 99 (D.D.C. 2013).

Below, the private-interest factors are addressed first, followed by the public-interest factors.

### A. Private-Interest Factors Weigh in Favor of Transfer

Six private-interest factors are generally employed by courts in this District to assess the "convenience of parties and witnesses," 28 U.S.C. § 1404(a): "(1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) where the claim arose; (4) the convenience of the parties; (5) the convenience of the witnesses; [and] (6) the ease of access to sources of proof." *Md. Digital Copier v. Litig. Logistics, Inc.*, 394 F. Supp. 3d 80, 95 (D.D.C. 2019); *see also Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996) (first articulating these factors).[1]

The first private-interest factor—plaintiff's choice of forum—is generally afforded deference, but "that deference is minimized where the 'plaintiff's choice of forum has no meaningful ties to the controversy and no particular interest in the parties or the subject matter.'" *Lentz v. Eli Lilly and Co.*, 464 F. Supp. 2d 35, 38 (D.D.C. 2006) (quoting *Greater Yellowstone Coal. v. Bosworth*, 180 F. Supp. 2d 124, 128 (D.D.C. 2001); *see also Pac. Mar. Ass'n v. N.L.R.B.*, 905 F. Supp. 2d 55, 60 (D.D.C. 2012) (Howell, J.) (noting that plaintiff's chosen forum is afforded less deference where the "'plaintiff's choice of forum is not the plaintiff's home forum'" (quoting *Stockbridge-Munsee Cmty. v. United States*, 593 F. Supp. 2d 44, 47 (D.D.C. 2009)); *Pain v. United Techs. Corp.*, 637 F.2d 775, 783 (D.C. Cir. 1980) ("[A] trial judge must

---

[1] These factors are regularly used by this Court without being expressly condoned by the Supreme Court or the D.C. Circuit, and appear to have been adopted from legal treatises and decisions in other Circuits. *See Trout Unlimited*, 944 F. Supp. at 16 & nn.4-9. The parties do not dispute that these factors appropriately guide the private-interest inquiry. *See* Defs.' Mot. at 3; Pl.'s Opp'n at 11-14.

give considerable, but not conclusive, weight to the plaintiff's initial forum choice."), *overruled in part on other grounds by Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981).

Plaintiff is a resident of Nebraska currently stationed in New Hampshire, so the District of Columbia is in no sense his "home forum." Deference to plaintiff's choice of forum is further diminished because the District of Columbia has no meaningful ties to the controversy. *See Ngonga v. Sessions*, 318 F. Supp. 3d 270, 275 (D.D.C. 2018) (deference to plaintiff's choice of forum not "warranted where the plaintiff's choice . . . has no meaningful ties to the controversy, and where transfer is sought to a forum with which plaintiffs have substantial ties and where the subject matter of the lawsuit is connected") (cleaned up); *Shawnee Tribe v. United States*, 298 F. Supp. 2d 21, 26 (D.D.C. 2002) (venue not appropriate in the District of Columbia "especially where the involvement of government officials in Washington has not been significant, and there is no real connection between the District of Columbia and th[e] litigation"). The only action that plaintiff alleges took place in this District was Nunan's rejection of his appeal challenging his dismissal from the Academy, Compl. ¶ 9, whereas all events leading to plaintiff's disenrollment—including his initial disenrollment by Kelly—took place in Connecticut. Hence, because the District of Columbia is not the plaintiff's home forum and only has an attenuated connection to this controversy, plaintiff's selection of venue is entitled to only minimal deference without weighing significantly against transfer.

The second and third private-interest factors—defendants' preference of forum and the district in which the claim arose—also favor transfer. Defendants seek transfer to the District of Connecticut due to their "preference to litigate this case where most of the acts occurred." Defs.' Mot. at 5. As noted, the complaint makes evident that, apart from the final denial of plaintiff's disenrollment appeal occurring in this District, Compl. ¶¶ 6, 9, the entirety of events giving rise

9

to plaintiff's statutory and constitutional claims under the APA, Fifth Amendment, and MWPA took place at the Academy in New London, Connecticut. Defendants' proposed choice of forum (Connecticut) is the true locus of this dispute.

Nevertheless, plaintiff insists that, because his claims in part involve an alleged failure to adhere to a generally-applicable Coast Guard policy for responding to incidents of sexual assault—which policy is formulated and ultimately enforced in Washington, D.C. by Coast Guard leadership such as defendants Schultz and Nunan—his claims can be said to "arise" in this District. *See* Pl.'s Mem. Opp'n Defs.' Mot. to Transfer ("Pl.'s Opp'n"), at 7-8, ECF No. 14; *id.* at 8 ("Venue is proper in this District because Defendants Schultz and Nunan are ultimately responsible for the abject leadership and policy failures pleaded with particularity in Plaintiff's Complaint."). Not so. Venue in this District is not justified merely because a national policy stems from the District of Columbia and is marginally implicated in a plaintiff's claims. Indeed, plaintiff does not challenge the legality of the Coast Guard's SAPR policy but instead takes issue with the allegedly faulty application of that policy to his circumstances by Coast Guard officials in Connecticut. *See Wolfram Alpha LLC v. Cuccinelli*, 490 F. Supp. 3d 324, 331 (D.D.C 2020) ("The location of activities giving rise to the action weigh[ed] heavily in favor of transfer."); *Ngonga*, 318 F. Supp. 3d at 275 ("When the material events that form the factual predicate of a plaintiff's claim did not occur in his chosen forum, transfer is favored." (citations omitted)); *Shawnee Tribe*, 298 F. Supp. 2d at 25 ("While some officials . . . who work in the Washington, D.C. area are involved in the [matter at issue], the decisionmaking process . . . has not been substantially focused in this forum" and "mere involvement on the part of . . . federal officials who are located in Washington D.C. is not determinative."). Thus, the second and third private-interest factors heavily favor transfer.

The fourth and fifth factors—convenience to the parties and witnesses—further favor transfer in this case. To be sure, "[a]dministrative review cases 'are often resolved on cross-motions for summary judgment,'" with no factual discovery necessary or even proper. *W. Watersheds Project*, 306 F. Supp. 3d at 360 (quoting *Pac. Ranger, LLC v. Pritzker*, 211 F. Supp. 3d 196, 209 (D.D.C. 2016) (Jackson, J.)); *see* Pl.'s Opp'n at 13 (noting that "Count I of the Complaint is an APA claim for which, under normal circumstances, discovery would be limited to the administrative record"). Yet, the remaining counts are non-APA claims for which "depositions of witness[es] would be proper," and plaintiff makes clear that he "has every intention of seeking testimonial discovery." Pl.'s Opp'n at 13. Perhaps realizing that this argument would favor transfer given that most, if not all, relevant witnesses are in Connecticut, *see* Defs.' Mot. at 6 ("Even if witnesses were called, most of the witnesses likely would be found in the District of Connecticut."), plaintiff asserts that because of advances in technology allowing for remote hearings and depositions, the convenience of witnesses should be considered a neutral factor. Pl.'s Opp'n at 13.

The evolving nature of the COVID-19 pandemic makes any determination of whether any future hearings or depositions in this matter will proceed in person or virtually somewhat speculative. Even in the context of the ongoing pandemic, however, "live testimony [remains] markedly preferable to remote testimony." *FTC v. Illumina, Inc.*, No. 21-cv-873 (RC), 2021 WL 1546542, at *3 (D.D.C., Apr. 20, 2021). With the defendants most directly involved in the allegations giving rise to plaintiff's claims residing in Connecticut, "witnesses related to [those] Defendants' activities are likely to reside in" the transferee district, which traditionally has favored transfer. *Wolfram Alpha LLC*, 490 F. Supp. 3d at 334. In addition, given that plaintiff is currently stationed in New Hampshire and is otherwise a resident of Nebraska, Compl. ¶¶ 12,

21, 136, appearing in this District is—at a minimum—unlikely to be more convenient for him than appearing in the transferee district.[2] The fourth and fifth private interest factors therefore favor transfer.

As to the final private-interest factor—the availability of evidence—the parties agree that, to the extent this action raises an APA challenge to an agency decision likely to be resolved on the administrative record, this factor is of minimal relevance. *See* Defs.' Mot. at 7; Pl.'s Opp'n at 13-14; *see also W. Watersheds Project*, 306 F. Supp. 3d at 360; *Ctr. for Env'tl Sci., Accuracy & Reliability v. Nat'l Park Serv.*, 75 F. Supp. 3d 353, 358 (D.D.C. 2014) (noting that "ease of access to proof" was "largely irrelevant" in determining venue in case reviewing agency action). Yet, to the extent other claims are subject to discovery and evidence beyond the administrative record is required, such evidence will be found primarily in the District of Connecticut.

Based on the foregoing, the private interest factors weigh, on balance, in favor of transfer to the District of Connecticut.

### B. Public-Interest Factors Also Weigh in Favor of Transfer

Finally, the Court must assess the public-interest factors that are implicated by defendants' request to transfer this action. Those factors have been described traditionally as "(1) the transferee forum's familiarity with the governing laws and the pendency of related actions in that forum; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home." *Foote v. Chu*, 858 F. Supp. 2d at 116, 123 (D.D.C. 2012); *see Atl. Marine Constr. Co.*, 571 U.S. at 62 n.6. The parties agree that the first of these factors is inapplicable and thus neutral here since the

---

[2] Plaintiff also argues against transfer because his counsel is not barred in the transferee court and resides in or near the District of Columbia. Pl.'s Opp'n at 12-13. This argument is unavailing. As this Court has stated before, "[w]here counsel resides is of little relevance for purposes of evaluating venue transfer motions." *Stand Up for Cal.! v. Dep't of Interior*, 919 F. Supp .2d 51, 64 (D.D.C. 2013) (Howell, J.) (quotation marks omitted).

12

instant action arises under federal law. *See* Defs.' Mot. at 7-8; Pl.'s Opp'n at 14; *see also Oceana v. Bureau of Ocean Energy Mgmt.*, F. Supp. 2d 70, 78 (D.D.C. 2013) (first factor "is generally applied in cases that implicate state law, with which federal courts are not equally familiar").

The second factor, the relative congestion of the courts, weighs in favor of transfer. As defendants point out, "[e]ven indulging the assumption that every senior status judge [in this District] carries a full caseload, [the respective court calendars of the districts] still work out to nearly 256 cases per judge in [the District of Columbia], versus less than 195 cases per judge in the District of Connecticut." Defs.' Reply in Supp. Mot. to Transfer at 5, ECF No. 17; *see also* Defs.' Mot. at 8 ("As of December 31, 2021, the most recent date for which data is available, 4,326 civil cases were pending in this District, compared to only 2,121 civil cases in the District of Connecticut."). Although "statistics are not perfect indicators of court congestion," *Wolfram Alpha LLC*, 490 F. Supp. 3d at 336, on account of the considerable differences in caseloads between districts across different metrics, this factor favors transfer.

The third and final factor—the "local interest in having localized controversies decided at home"—also weighs in favor of transfer. *Adams v. Bell*, 711 F.2d 161, 167 (D.C. Cir. 1983). The interest in adjudicating local issues at home still "applies to controversies . . . requiring judicial review of an administrative decision," as in part here. *Sierra Club v. Flowers*, 276 F. Supp. 2d 62, 70 (D.D.C. 2004). Plaintiff's assertions that this is a matter of "national interest and importance" are overstated. Pl.'s Opp'n at 14. While plaintiff may be correct that "sexual assault at the Coast Guard Academy, and retaliation for reporting such an assault, is not some localized malady unique to Connecticut," *id.* at 15, the fact remains that the locus of plaintiff's case is New London, Connecticut, and its outcome will most directly impact not only plaintiff

but also "the Academy and the officials who run it," Defs.' Mot. at 9. *See Wolfram Alpha LLC*, 490 F. Supp. 3d at 339 (finding this factor favored transfer when "outcome of . . . action will be felt most strongly in the Central District of Illinois and because the events giving rise to . . . action emerged from that district"). Plaintiff seeks individualized relief based on events, actions, and omissions over the span of two years which substantially occurred at the Academy, including his disenrollment and the retaliation and other allegedly unlawful conduct to which he was subjected primarily by defendant Inyang and other Academy officials. That a single, high-ranking Coast Guard official located in this District (defendant Nunan) denied plaintiff's second appeal from disenrollment does not transform a local, albeit serious, matter into one of national importance, nor does it supersede the significant interest that Connecticut has in adjudicating a matter primarily affecting a local institution and local defendants.

Therefore, the public-interest factors, like the private-interest factors, weigh in favor of transferring venue.

## IV.     CONCLUSION AND ORDER

For the reasons stated above, the Court finds that transfer to the District of Connecticut is in the interest of justice and warranted under 28 U.S.C. § 1404(a). Accordingly, upon consideration of the memoranda and exhibits submitted in support and opposition to the pending motion to transfer, and the entirety of the underlying record, it is hereby

**ORDERED** that defendants' Motion to Transfer, ECF No. 13, is **GRANTED**; and it is further

**ORDERED** that the Clerk shall transfer this case to the U.S. District Court for the District of Connecticut; and it is further

**ORDERED** that defendants' deadline to respond to the complaint is stayed for 30 days following the District of Connecticut's acceptance of this case for transfer.

**SO ORDERED.**

Date: June 14, 2022

_____
BERYL A. HOWELL
Chief Judge